[Crim. No. 4404. In Bank. Apr. 20, 1942.]

THE PEOPLE, Respondent, v. ALFRED HORACE WELLS, Appellant.

192

Theodore G. Krumm for Appellant.

Earl Warren, Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

THE COURT.—In an information filed by the District Attorney of San Bernardino County, the appellant Wells was charged with the murder of three persons. He entered pleas of not guilty and not guilty by reason of insanity. Following the trial on the general issue, the jury returned a verdict on each count, finding appellant guilty of murder of the first degree without recommendation. He thereupon withdrew his insanity plea. Judgment was entered imposing the death penalty on each of the three counts and motion for new trial was denied. This appeal from the judgment and order is an automatic one under section 1239 of the Penal Code.

No brief has been filed on behalf of appellant. We have nevertheless examined the entire record and find substantial evidence of appellant's guilt.

Wells, approximately 31 years old, had been living for several months with his half-sister, aged 20, in an illict relationship. She testified that appellant frequently threatened to kill anyone who might attempt to interfere with their relationship, and made such threats to his brother, Raymond, aged 25. Appellant's employer testified that appellant confided that his brother and sister-in-law "were endeavoring to break up his relationship with Violet and that if they succeeded in doing that he would get a gun and kill them." In time Raymond and his wife Jean persuaded Violet to leave appellant. Her mother, appellant's stepmother, testified that

appellant immediately sought to locate the girl, stating that he could not get along without her. The owner of the premises where appellant had lived with his half-sister testified that Wells had blamed his brother Raymond and sister-in-law Jean for taking the girl from him and had threatened to "get" them for it. In later conversations, appellant told the witness that he would kill his brother and sister-in-law "as soon as he could get a gun." Several other witnesses testified that appellant arranged to procure a gun from one of them stating, "I have been out of the penitentiary for two years. . . . I might as well go ahead and get my revenge." Several of these witnesses saw appellant in the company of two of his victims just before their deaths.

Following his apprehension in Spokane, Washington, approximately one month after the triple homicide, appellant made a voluntary confession in the presence of a deputy district attorney, a court reporter and certain law enforcement officers. He admitted procuring a gun, calling at his brother's home on May 7, 1941, and inquiring of his sister-in-law as to his brother's whereabouts. She told him that her husband was working late that evening and offered to drive appellant to his place of employment. She took her baby, and a young woman, Rose Destree, who was visiting her at the time, in an automobile with appellant to take him to his place of employment. Appellant directed them into the hills where he ordered the car stopped. He thereupon directed his sister-in-law to write a note to her husband, and when that was done he admittedly shot her in cold blood. She died almost instantly. Rose Destree, a comparative stranger to appellant, was shot by him as she attempted to flee, and died several hours later. Appellant wrapped his coat about the baby and left.

Appellant, by his own admission, then returned to his brother's home and awaited his arrival on the front porch where he was observed by certain neighbors who appeared as witnesses at the trial. Some of these witnesses also saw appellant's earlier departure with the two women and the baby and his return alone. When his brother arrived appellant greeted him and gave him the note from his wife. As the brother finished reading, appellant commanded him at the point of a gun to get into the automobile, and they proceeded into the hills. Again in cold blood appellant shot and killed his victim. In his statement appellant related how he then fled the scene in his dead brother's car and drove it to Las

Vegas, Nevada, where he parked it in a garage. The garage attendant identified appellant as the person who had left the car. Thereafter he moved from place to place until his apprehension in Spokane. He further stated that he had murdered his victims in this "raw" fashion as the possible foundation for an ultimate insanity defense.

There is much additional evidence definitely linking appellant with the homicides. A friend who had seen appellant, apparently between the time he shot the women and the time he saw his brother, testified that appellant was "perspiring awfully heavy and seemed nervous" and had asked the witness to go to his house and pick up some things for him because he had "left [his] coat wrapped around a baby" and wanted to get his "business attended to before they catch me," adding "I don't want the police to get to me before I get him."

The convincing character of the evidence pointing to appellant's guilt warranted the jury in rejecting as wholly lacking in credence his testimony as a witness in his own defense that "I don't remember shooting nobody no place." It is significant, however, that when on the stand he admitted the illicit relationship with his half-sister and the fact that she ultimately left him. He related that after unsuccessfully seeking her return he had done some drinking and smoked some marihuana cigarettes. He admitted obtaining a gun from one of the prosecution witnesses, driving to Las Vegas in his brother's car, which he parked in a garage, and leaving that town by freight train. He testified that he had "rigged" up his statement to the authorities in order to secure permission to see his half-sister privately and to keep her name clear. The prosecution produced witnesses who saw appellant on the day of the homicides in a sober condition and other witnesses who testified that he had told them subsequent to the homicides that he had never used narcotics of any kind.

It was the exclusive province of the jury to weigh and resolve the few contradictions that exist in the evidence. As we read the record the jury had no alternative but to return a verdict of guilty on each of the three charges. We have found no errors in the rulings on the evidence or in the giving of instructions, which were full and fair. The verdicts and judgment are amply supported by substantial and credible evidence.

The judgment and order denying a new trial are therefore affirmed.